STATE, Respondent, v. McCARTER, Appellant.

*October 6—October 31, 1967.*

610

For the appellant there was a brief and oral argument by *Burton B. Polansky* of Milwaukee.

For the respondent the cause was argued by *E. Michael McCann,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Hugh R. O'Connell,* district attorney.

HANSEN, J.

*Did the evidence establish defendant's guilt beyond a reasonable doubt?*

The defendant contends that he did not form the intent to kill as required for conviction of first-degree murder as defined in sec. 940.01, Stats.,[1] and consequent-

[1] "940.01 **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

ly his conviction for attempted first-degree murder cannot be sustained.

The defendant testified that he was not angry with his wife and had no intention of hurting her. He merely wanted to frighten his mother-in-law. Shortly after the incident, when questioned by police, he stated he thought that he had shot his mother-in-law rather than his wife and remembered only the first allegedly accidental shot, but not the subsequent three shots.

However, an examination of the record reveals that at the time of the shooting, the defendant, his wife and his father-in-law were the only people in the dining room. The defendant's mother-in-law was in an adjoining bedroom with the door closed and heard him say, "You don't love me" shortly before the first shot was fired. His father-in-law was holding his hands in such a manner that for the most part he was facing the defendant and the defendant was facing his wife. The father-in-law testified, ". . . he was much stronger and I couldn't take the shots off, I mean by moving, I couldn't throw the gun far enough away to keep the shots from entering into her body." She was shot four times with bullets from a .38-caliber double action revolver that had a 13½ pound trigger pull.

"It is a general rule, applicable in all criminal cases, including those where a specific intent is an element of the crime, that accused, if sane, is presumed to intend the necessary or the natural and probable consequences of his unlawful voluntary acts, knowingly performed." 22 C. J. S., *Criminal Law*, p. 121, sec. 35; *State v. Vinson* (1955), 269 Wis. 305, 309e, 68 N. W. 2d 712, 70 N. W. 2d 1; *State v. Carlson* (1958), 5 Wis. 2d 595, 604, 93 N. W. 2d 354.

In the instant case, the natural and probable consequence of the act was death, and the law so presumes. This presumption can, of course, be rebutted by evidence to the contrary, which rebuttal evidence must be considered and evaluated by the trier of fact.

"On review the test to be applied is 'whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt.' This test is equally applicable where trial has been to the court." *Alston v. State* (1966), 30 Wis. 2d 88, 100, 140 N. W. 2d 286. *State v. Waters* (1965), 28 Wis. 2d 148, 153, 135 N. W. 2d 768.

"The credibility of the witnesses is properly the function of the jury or the trier of fact, in this case the trial judge. It is only when the evidence that the trier of fact has relied upon is inherently or patently incredible that the appellate court will substitute its judgment for that of the fact finder, who has the great advantage of being present at the trial." *Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101, certiorari denied, 383 U. S. 916, 86 Sup. Ct. 910, 15 L. Ed. 2d 671.

On the question of the sanity of the defendant, the testimony of the expert psychiatrists indicates that the defendant's intentions were directed at his mother-in-law rather than his wife. However, under the facts of this case, his motivation is immaterial insofar as it excuses his actions. His acts and their near-fatal consequences bespeak the intention which the trial court determined he possessed.

In his remarks, at the time of sentencing, the trial judge made the following pertinent observation:

". . . so between murder and attempted murder there is just the fortuitous circumstance and the grace of God that saved the victim from death on the part of the defendant here."

We conclude that the evidence adduced, believed and rationally considered was sufficient to prove the guilt of the defendant beyond a reasonable doubt.

### Sanity of Defendant.

This case was adjudicated prior to *State v. Shoffner* (1966), 31 Wis. 2d 412, 143 N. W. 2d 458 and the test of insanity which was properly applied was that estab-

lished in *State v. Esser* (1962), 16 Wis. 2d 567, 599, 115 N. W. 2d 505:

"The term 'insanity' in the law means such an abnormal condition of the mind, from any cause, as to render the defendant incapable of understanding the nature and quality of the alleged wrongful act, or incapable of distinguishing between right and wrong with respect to such act."

Dr. R. A. Jefferson, a court-appointed psychiatrist, testified as follows:

"*Q.* . . . I will ask you whether you have formed an opinion as to whether the defendant was sane or insane at the time of the alleged commission of the alleged offense on the 31st day of January, 1965. *A.* I have formed an opinion.

"*Q.* What is that opinion? *A.* It is my opinion that Paul Edward McCarter was sane, that he understood the nature and quality of his acts, that he was not feebleminded and that he was able to confer with his counsel in his own behalf."

"*Q.* State whether or not in your opinion, Doctor, at the time of the alleged commission of the alleged offense on the 31st day of January, 1965, the defendant had such an abnormal condition of the mind from any cause as to render him incapable of distinguishing between right and wrong with respect to such alleged wrongful act. *A.* It is my opinion that he was able to distinguish between right and wrong."

"*Q.* . . . Have you an opinion as to whether his act of shooting on January 31, 1965, was the product of any mental disease, mental defect or mental abnormality? *A.* No, it was not."

"*Q.* . . . *A.* Yes, I think I understand and I think that I have said that in my opinion he was sane, that he did know the difference between right and wrong, but at the time of commission of the act he was in a severe emotional crisis which impaired his capacity to act upon his knowledge of the nature and consequences, full consequences of his act."

"*Q.* And it is also your opinion, Doctor, is it not, that the defendant was not insane at the time of the crime? *A.* It is my opinion that he was not insane at the time of the commission of the crime."

Dr. Edward Carl Schmidt, the second court appointed psychiatrist, testified as follows:

"Q. . . . I will ask you whether you have formed an opinion as to whether the defendant was sane or insane at the time of the alleged commission of the alleged offense on the 31st day of January, 1965. A. Yes, I have formed such an opinion.

"Q. What is that opinion? A. My opinion is that Paul Edward McCarter was sane on the day of the alleged offense, January 31, 1965."

"Q. . . . A. I do not believe that he was incapable of distinguishing between right and wrong at the time of the act."

"Q. . . . A. . . . he developed this dissociated large reaction and at the time of that reaction he was not insane but his ability to determine the nature and quality of his acts was undoubtedly reduced. I don't think his ability to determine the criminality of his acts was reduced, however."

"Q. It was your testimony, was it not doctor, that his ability to evaluate the nature and quality of his acts was impaired because of an emotional strain and not a generally recognized mental disease or defect, is that correct? A. Yes."

"Q. What I meant to say is your conclusion predicated upon your assumption of the truthfulness of the statements that you have said are practically identical, made to you, and also in his testimony? A. Yes."

"Q. Do you consider an emotional crisis a generally recognized mental disease or defect? A. No.

"Q. And you do not obviously equate it with insanity? A. I do not.

"Q. Since you stated he was in your opinion sane? A. Correct.

"Q. So it is your opinion then that he is not mentally— A. He was at that time not mentally ill."

Dr. Jefferson also testified that defendant suffered from a severe emotional crisis which, on cross-examination, he ambiguously described as an "abnormality." However, this testimony must be considered in conjunction with the previously cited testimony and we conclude that the trial court correctly decided that the evidence

would not support a finding of "such an abnormal condition of the mind" as defined in *Esser, supra.*

The defendant alleges that the testimony of the psychiatrists created more than a reasonable doubt as to defendant's sanity, and consequently, the burden of proof should have been shifted to the state to establish his sanity. This argument is based upon sec. 957.11 (2), Stats.,[2] and *Shoffner,* page 420, *supra.*

In the case presently under consideration, we again point out, the trial was to the court and not a jury. From an examination of the record, it is our opinion that the trial court correctly concluded that no reasonable doubt as to the sanity of the defendant ever arose.

We determine that the trial court properly found that the defendant was sane at the time of the commission of the alleged offense.

*Scope of Preliminary Examination.*

At the preliminary examination, the magistrate refused to permit counsel for defendant to call defendant's mother-in-law as a witness. She was present in court but had not been subpoenaed as a witness.

Sec. 954.08 (1), Stats.,[3] gives the defendant the right to call witnesses.

---

[2] "957.11 **Plea of insanity as defense.** . . .

"(2) The presumption of the defendant's sanity and mental normality at the time he committed the alleged crime shall prevail on the trial of the special issue unless the evidence creates in the minds of the jury reasonable doubt of his sanity or mental responsibility at said time."

[3] "954.08 **Preliminary examination; separation of witnesses; transfer of examination.** (1) WITNESSES EXAMINED AND CROSS-EXAMINED. As soon as may be, the magistrate shall swear and examine or permit the district attorney to examine the witnesses for the state, in the presence of the defendant, in relation to the crime charged in the complaint; and they may be cross-examined. Then the witnesses for the defendant shall be sworn and examined and may be cross-examined. The defendant may be assisted by counsel."

In *State v. Miller* (1967), 35 Wis. 2d 454, 478, 151 N. W. 2d 157, it was stated that Wisconsin does not recognize a right in defendant to pretrial discovery of the prosecution's evidence. In the case now under consideration, there is no indication in the record that defendant intended to call his mother-in-law in order to effect pretrial discovery of the state's evidence. Likewise, there is no indication that defendant's purposes were not defensive in nature.

In keeping with the provisions of sec. 954.08 (1), Stats., and considering the record now before us, the magistrate should have permitted defendant's counsel to call defendant's mother-in-law as a witness. The ruling not to permit her to testify was contra to the expressed language of the statute.

However, in examining defendant's brief we note that on June 18, 1965, a writ of habeas corpus was brought to the circuit court for Milwaukee county upon the apparent grounds that defendant did not have a proper preliminary examination. The brief further states that the circuit judge before whom the writ was brought "issued a written decision determining that the defendant was legally detained under and by virtue of a valid order of commitment."

Defendant's proper remedy was an appeal from the order denying the writ of habeas corpus and the time for such an appeal has long expired.

*By the Court.*—Judgment affirmed.